

# IN THE
# TENTH COURT OF APPEALS

_____

## No. 10-14-00290-CV

_____

## IN THE INTEREST OF T.R.L. AND C.J.L., CHILDREN

_____

**From the 18th District Court**
**Johnson County, Texas**
**Trial Court No. D201306196**

## MEMORANDUM  OPINION

Appellants K.L. and J.R.L. each challenge the trial court's order of termination of their parental rights to T.R.L. and C.J.L.  We will affirm.

In a proceeding to terminate the parent-child relationship brought under section 161.001 of the Family Code, the Department must establish by clear and convincing evidence two elements:  (1) one or more acts or omissions enumerated under subsection (1) of section 161.001, termed a predicate violation; _and_ (2) that termination is in the best interest of the child.  TEX. FAM. CODE ANN. § 161.001(1), (2) (West 2014); _Swate v. Swate_, 72 S.W.3d 763, 766 (Tex. App.—Waco 2002, pet. denied).  The factfinder must find that both elements are established by clear and convincing evidence, and proof of one

element does not relieve the petitioner of the burden of proving the other. *Holley v. Adams,* 544 S.W.2d 367, 370 (Tex. 1976); *Swate,* 72 S.W.3d at 766. If multiple predicate violations under section 161.001(1) were found in the trial court, we will affirm based on any one ground because only one predicate violation under section 161.001(1) is necessary to a termination judgment. *In re T.N.F.,* 205 S.W.3d 625, 629 (Tex. App.—Waco 2006, pet. denied), *overruled in part on other grounds by In re A.M.,* 385 S.W.3d 74, 79 (Tex. App.—Waco 2012, pet. denied).

The evidence presented at the bench trial was as follows: Department employee Viola Hogan testified that she began investigating claims of abuse or neglect of two-year-old T.R.L. and four-day-old C.J.L. on September 6, 2013 after allegations were made of drug abuse and domestic violence between their parents K.L. (mother) and J.R.L. (father). When Hogan first made contact with K.L., K.L. admitted that there was domestic violence in her relationship with J.R.L. There was no documentation of the domestic violence, and J.R.L. had not been arrested for it, but K.L. told Hogan that J.R.L. had hit her during an argument that they had gotten into after J.R.L.'s motorcycle had been wrecked. K.L. indicated that it was the only domestic-violence incident.

Regarding the drug-abuse allegation, Hogan asked K.L. to take an oral-swab drug test, but K.L. refused and said that she did not have "luck" with those in the past. On Hogan's request, however, K.L. did go for a urinalysis on September 6. It came back positive for amphetamines, methamphetamines, and alcohol. Hogan also asked J.R.L. to submit to a drug test. J.R.L.'s drug test came back negative for all substances, but Hogan said that she did not observe J.R.L. take the drug test and that the person who

took the drug test did not present identification.

Hogan testified that she believed that K.L.'s and J.R.L.'s actions endangered the physical or emotional well-being of T.R.L. and C.J.L. and that K.L. and J.R.L. placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being. Hogan explained that T.R.L. and C.J.L. are at an extremely vulnerable age; T.R.L. also has Williams syndrome, a degenerative disease that requires extra care to meet his medical needs. Hogan stated that if left in the care of someone under the influence of drugs or alcohol, the children could be injured accidentally by that person.

Finally, Hogan testified that K.L. and J.R.L. have a prior history with Child Protective Services not only in Texas but also in Washington State. K.L. and J.R.L. have a total of seven children, four together, none of whom are in their custody. The allegations in previous cases involved drug use. Hogan stated that there have been multiple interventions with this family to try to address their problems but that none have been successful.

CPS caseworker Sherri Sides testified that she had the case from September 25, 2013 to March 1, 2014. She prepared a Service Plan for the parents, but neither J.R.L. nor K.L. completed any services during the time that she had the case. Notably, the trial court suspended J.R.L.'s and K.L.'s visitation with the children until they could take three negative drug tests.[1] The court also ordered random drug testing of K.L. and

---

[1] Sides stated that the Department mistakenly allowed one visitation to occur before she learned that the trial court had suspended the parents' visitation.

J.R.L., but when Sides contacted the parents and requested that they submit to at least two urinalyses, the parents did not take the drug tests. K.L. and J.R.L. likewise never contacted the Department to take a drug test.

Sides testified that she was concerned about K.L.'s and J.R.L.'s past drug abuse, as well as domestic violence between the two parents. Sides said that the Department believed that the parents' drug use actually endangered the physical and emotional well-being of T.R.L. and C.J.L. Sides was especially concerned about the results of the drug test K.L. took when C.J.L. was only four days old. Sides acknowledged that K.L. contacted her on more than one occasion to check on the children but stated that she also believed that K.L. and J.R.L. emotionally harmed the relationship between themselves and the children by not remaining drug-free and submitting to drug tests so that visitation could start again. Sides concluded that she believed that termination of K.L.'s and J.R.L.'s parental rights was in the best interest of the children because of the children's ages and vulnerability, especially considering T.R.L.'s medical issues, which require ongoing medical treatment.

Amy Gray testified that she became the Department caseworker for T.R.L. and C.J.L. in March 2014. She continued to provide services and support for the parents in completing the Service Plan, but the parents were uncooperative.[2] Again, notably, on March 7, K.L. took a drug test that had been requested by Gray; the results were positive for marijuana. J.R.L. also took a drug test that day; his results were positive for

---

[2] K.L. and J.R.L. did submit a certificate of completion for a parenting class, and Gray acknowledged that K.L. had been to every court hearing. J.R.L. also reported that he was employed but refused to provide Gray copies of paystubs or paychecks as requested.

methamphetamines and amphetamines. On June 28, Gray attempted to contact K.L. and J.R.L. to request that they take another drug test, but their phone numbers were no longer in service, and Gray was unable to locate them at that time. On September 8, Gray again contacted K.L. and J.R.L. and requested that they take a drug test, but they did not do so.

Gray testified that her concerns were that K.L. and J.R.L. place their own needs over those of their children and show no interest in parenting or being part of their children's lives. The parents have a pattern of continuing to use drugs and refusing to take advantage of the services offered. Gray explained that in 2010, K.L.'s and J.R.L.'s parental rights were terminated to other children because of ongoing drug use that they were unwilling to stop. They do not have custody or guardianship of any of their children. Gray stated that K.L.'s and J.R.L.'s lack of action in this case has also endangered the physical or emotional well-being of T.R.L. and C.J.L. because they had opportunities to build a bond with the children and failed to take those opportunities. It is a major concern to Gray for T.R.L. and C.J.L. to be placed back in a home with parents that they have not had contact with in a year. Specifically, C.J.L. has spent eleven of his twelve months of life away from K.L. and J.R.L.; therefore, there would be no bond.

After the Department rested, J.R.L. testified that he and K.L. are married and live in a three-bedroom mobile home. He has done maintenance work for Sabre Communications for seven years. At the time of trial, he had been working about sixty-eight hours per week and bringing home about $1,000 each week; he provided a

paycheck stub to both Gray and another caseworker. He also had about $18,000 in retirement. J.R.L. stated that he believes that he makes enough money to support the children.

Regarding the Service Plan, J.R.L. testified that he and K.L. completed the parenting classes and attended the court dates but that he had not had an opportunity to complete the rest because he could not get off of work. He stated that he and Gray also had some communication breakdowns. He called her twice and left messages, but she did not return his calls. She did not offer drug tests to K.L. and him, and he would have taken all the random drug tests if they had been offered. If he took a drug test at the time of trial, it would have been clean because he was not currently using methamphetamine. It had been about a year since the last time he had used methamphetamine.

On cross-examination, J.R.L. agreed that it was concerning that he has fathered multiple children but that he does not have possession of any of them. He acknowledged that he used methamphetamine before C.J.L. was born and before the children were removed; however, he did not agree that his actions placed his children in immediate danger for their physical and emotional well-being. Regarding the positive drug-test results from March 2014, he said, "There's no way," and "That can't be true." He also said that the concerns about domestic violence were not valid concerns. Although it upset him a little when his nephew wrecked his motorcycle, he never laid hands on his wife.

K.L. testified that she and her husband J.R.L. live in a three-bedroom home in a

quiet, peaceful neighborhood. They have four children together. She has three other children, but she gave guardianship of those children to her mother after their father was killed. She is not employed. Regarding the Service Plan, she had taken the parenting class and attended the court proceedings. She also contacted the Family Crisis Center about attending the domestic violence awareness class three or four times but was on the waiting list. She never received a request from Gray or Sides to take a drug test. In fact, Gray never returned her calls. K.L. said that she does not do illegal drugs and that if she took a drug test on the day of trial, it would be negative. She does not know why the March 2014 drug test came back positive for marijuana. The last time she used illegal substances was before T.R.L. and C.J.L. were conceived. K.L. also stated that she was confused about the domestic violence situation when she spoke with Hogan. Instead, she and J.R.L. are just like any other couple. They have "little arguments here and there" but not in the presence of the children.

After the bench trial, the trial court found the following predicate violations as grounds for termination of K.L.'s and J.R.L.'s parental rights: (1) that they knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered the physical or emotional well-being of the children (TEX. FAM. CODE ANN. § 161.001(1)(D)); and (2) that they engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being (*id.* § 161.001(1)(E)). The trial court also found that termination of K.L.'s and J.R.L.'s parental rights was in the children's best interest.

**Sufficiency of the Evidence**

In their first two issues, both K.L. and J.R.L. challenge the legal and factual sufficiency of the evidence to support the trial court's findings on the statutory predicate grounds. In his third issue, J.R.L. challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination of his parental rights was in the children's best interest. In her third issue, K.L. challenges the factual sufficiency of the evidence to support the trial court's finding that termination of her parental rights was in the children's best interest.

The standards of review for legal and factual sufficiency in termination cases are well established. *In re J.F.C.*, 96 S.W.3d 256, 264-68 (Tex. 2002) (legal sufficiency); *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002) (factual sufficiency). In reviewing the legal sufficiency, we view all the evidence in the light most favorable to the finding to determine whether a trier of fact could reasonably have formed a firm belief or conviction about the truth of the Department's allegations. *In re J.L.*, 163 S.W.3d 79, 84-85 (Tex. 2005); *J.F.C.*, 96 S.W.3d at 265-66. We do not, however, disregard undisputed evidence that does not support the finding. *J.F.C.*, 96 S.W.3d at 266. In reviewing the factual sufficiency of the evidence, we must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *Id.* We must consider the disputed evidence and determine whether a reasonable factfinder could have resolved that evidence in favor of the finding. *Id.* If the disputed evidence is so significant that a factfinder could not reasonably have formed a firm belief or conviction, the evidence is factually insufficient. *Id.*

*Statutory Predicate Grounds*

To endanger means to expose to loss or injury, to jeopardize. *Tex. Dep't Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *see also In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). The specific danger to a child's physical or emotional well-being need not be established as an independent proposition, but it may be inferred from parental misconduct. *See Boyd*, 727 S.W.2d at 533.

> When termination of parental rights is based on section D, the endangerment analysis focuses on the evidence of the child's physical environment, although the environment produced by the conduct of the parents bears on the determination of whether the child's surroundings threaten his well-being. *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Section D permits termination if the petitioner proves parental conduct caused a child to be placed or remain in an endangering environment. *In re R.D.*, 955 S.W.2d 364, 367 (Tex. App.—San Antonio 1997, pet. denied).
>
> It is not necessary that the parent's conduct be directed towards the child or that the child actually be injured; rather, a child is endangered when the environment creates a potential for danger which the parent is aware of but disregards. *In re S.M.L.*, 171 S.W.3d at 477. Conduct that demonstrates awareness of an endangering environment is sufficient to show endangerment. *Id.* (citing *In re Tidwell*, 35 S.W.3d 115, 119-20 (Tex. App.—Texarkana 2000, no pet.) ("[I]t is not necessary for [the mother] to have had certain knowledge that one of the [sexual molestation] offenses actually occurred; it is sufficient that she was aware of the potential for danger to the children and disregarded that risk by ... leaving the children in that environment.")). In considering whether to terminate parental rights, the court may look at parental conduct both before and after the birth of the child. *Avery v. State*, 963 S.W.2d 550, 553 (Tex. App.—Houston [1st Dist.] 1997, no pet.). Section D permits termination based upon only a single act or omission. *In re R.D.*, 955 S.W.2d at 367.

*Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied); *see also In re C.W., Jr.*, No. 14-09-00306, 2009 WL 4694946, at *6 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (mem. op.).

Under subsection 161.001(1)(E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *In re K.A.S.,* 131 S.W.3d 215, 222 (Tex. App.—Fort Worth 2004, pet. denied); *Dupree v. Tex. Dep't Prot. & Reg. Servs.,* 907 S.W.2d 81, 83-84 (Tex. App.—Dallas 1995, no writ).

> Additionally, termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. [*In re J.T.G.,* 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.)]; *see* TEX. FAM. CODE ANN. § 161.001(1)(E). It is not necessary, however, that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd,* 727 S.W.2d at 533; *J.T.G.,* 121 S.W.3d at 125. The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *Boyd,* 727 S.W.2d at 533; *In re R.W.,* 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).

*In re T.T.F.,* 331 S.W.3d 461, 483 (Tex. App.—Fort Worth 2010, no pet.).

Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment. *See In re B.J.B.,* 546 S.W.2d 674, 677 (Tex. Civ. App.—Texarkana 1977, writ ref'd n.r.e.); *see also Sylvia M. v. Dallas County Welfare Unit,* 771 S.W.2d 198, 204 (Tex. App.—Dallas 1989, no writ) (considering "volatile and chaotic" marriage, altercation during pregnancy, and mother's repeated reconciliation with abusive spouse). Abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child. *Ziegler v. Tarrant County Child Welfare Unit,* 680 S.W.2d 674, 678 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e.); *see also K.A.S.,* 131 S.W.3d at 222 (violent or abusive conduct by someone within household is environment that endangers

children).

A parent's illegal drug use and drug-related criminal activity may also support a finding that the child's surroundings endanger his physical or emotional well-being. *In re Z.C.*, 280 S.W.3d 470, 474 (Tex. App.—Fort Worth 2009, pet. denied). And "[b]ecause it exposes the child to the possibility that the parent may be impaired or imprisoned, illegal drug use may support termination under section 161.001(1)(E)." *Walker v. Tex. Dep't Fam. & Prot. Servs.*, 312 S.W.3d 608, 617-18 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (citing *Vasquez v. Tex. Dep't Prot. & Reg. Servs.*, 190 S.W.3d 189, 195-96 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) (terminating parental rights despite there being no direct evidence of parent's continued drug use actually injuring child)). A factfinder may reasonably infer from a parent's refusal to take a drug test that the parent was using drugs. *In re C.R.*, 263 S.W.3d 368, 374 (Tex. App.—Dallas 2008, no pet.). A parent's continued drug use demonstrates an inability to provide for the child's emotional and physical needs and to provide a stable environment for the child. *In re F.A.R.*, No. 11-04-00014-CV, 2005 WL 181719, at *4 (Tex. App.—Eastland Jan. 13, 2005, no pet.) (mem. op.).

Both K.L. and J.R.L. argue that the evidence is legally and factually insufficient to support the trial court's findings under subsection (D) because the subsection concerns the suitability of the children's living conditions and, instead of providing evidence of the home environment in which the family lived, the Department focused on the conduct of the parents. K.L. and J.R.L. then argue that the evidence is legally and factually insufficient to support the trial court's findings under subsection (E). J.R.L.

argues that the alleged domestic violence was one single incident that was not committed in the presence of the children and that one incidence of drug use does not support the termination of parental rights. K.L. argues that the evidence of her conduct before the children's removal, at or around the time of the removal, and after the removal was insufficient to support a finding that she engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the physical or emotional well-being of the children.

First, inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his or her home represents a part of the "conditions or surroundings" of the child's home under subsection (D). *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.). Therefore, K.L.'s and J.R.L.'s conduct is relevant not only under subsection (E) but also under subsection (D).

The evidence shows that K.L. admitted to Hogan that J.R.L. hit her on one occasion even though both K.L. and J.R.L. later denied that the incident occurred. The evidence also shows that both K.L. and J.R.L. have a history of illegal drug use, not just one incidence of drug use as argued by J.R.L. According to Hogan and Gray, K.L. and J.R.L. have a prior history with Child Protective Services not only in Texas but also in Washington State, and the allegations in those cases involved drug use. Just a few days after C.J.L. was born, K.L. submitted to a drug test that came back positive for amphetamines, methamphetamines, and alcohol. And while J.R.L.'s drug test came back negative for all substances, he admitted that he used methamphetamine before

C.J.L. was born and before the children were removed.  Furthermore, after T.R.L. and C.J.L. were removed from the home and the trial court suspended the parents' visitation until they took three negative drug tests, K.L. and J.R.L. apparently continued to use illegal drugs, as evidenced by their failed drug tests and refusals to take drug tests.

Considering all the evidence in the light most favorable to the trial court's findings, we hold that a reasonable factfinder could have formed a firm belief or conviction that K.L.'s and J.R.L.'s parental rights should be terminated under subsections 161.001(1)(D) or 161.001(1)(E).  And on their factual-sufficiency complaints, after considering all of the evidence, we hold that a reasonable factfinder could have formed a firm belief or conviction that their rights should be terminated.  The evidence is legally and factually sufficient to support the jury's findings that K.L.'s and J.R.L.'s parental rights should be terminated under subsections 161.001(1)(D) or 161.001(1)(E). We overrule K.L.'s and J.R.L.'s first two issues.

*Best Interest of the Children*

In determining the best interest of a child, a number of factors have been considered, including (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals; (6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent.  *Holley*, 544 S.W.2d at 371-72.  This list is not

exhaustive, but simply indicates factors that have been or could be pertinent. *Id.*

The *Holley* factors focus on the best interest of the child, not the best interest of the parent. *Dupree,* 907 S.W.2d at 86. The goal of establishing a stable permanent home for a child is a compelling state interest. *Id.* at 87. The need for permanence is a paramount consideration for a child's present and future physical and emotional needs. *In re S.H.A.,* 728 S.W.2d 73, 92 (Tex. App.—Dallas 1987, writ ref'd n.r.e.) (en banc).

The evidence shows that at the time of trial, T.R.L. and C.J.L. were two years old and one year old, respectively. T.R.L. has Williams syndrome, a degenerative disease that requires extra care to meet his medical needs.

As stated above regarding the statutory predicate grounds, both K.L. and J.R.L. have a history of illegal drug use. *See In re W.E.C.,* 110 S.W.3d 231, 240 (Tex. App.—Fort Worth 2003, no pet.) ("Quite often, the best interest of the child is infused with the statutory offensive behavior."). According to Hogan and Gray, K.L. and J.R.L. have a prior history with Child Protective Services not only in Texas but also in Washington State, and the allegations in those cases involved drug use. Just a few days after C.J.L. was born, K.L. submitted to a drug test that came back positive for amphetamines, methamphetamines, and alcohol. And while J.R.L.'s drug test came back negative for all substances, he admitted that he used methamphetamine before C.J.L. was born and before the children were removed. Furthermore, after T.R.L. and C.J.L. were removed from the home and the trial court suspended the parents' visitation until they took three negative drug tests, K.L. and J.R.L. failed to build a bond with their children because they apparently continued to use illegal drugs, as evidenced by their failed drug tests

and refusals to take drug tests.

K.L. and J.R.L. testified that they want T.R.L. and C.J.L. back home. K.L. and J.R.L. live together in a three-bedroom home, and J.R.L. testified that he has stable employment. During the pendency of the case, both K.L. and J.R.L. also completed parenting classes. On the other hand, the goal of the Department for T.R.L. and C.J.L. is relative adoption with the maternal aunt of the children, who lives in Washington State. An interstate child placement compact home study had been done and approved by Washington State. She is aware of T.R.L.'s medical conditions and is prepared to have the children placed in her home.

Considering all the evidence in relation to the *Holley* factors in the light most favorable to the jury's finding, we hold that a reasonable factfinder could have formed a firm belief or conviction that termination of J.R.L.'s parental rights was in the children's best interest. On their factual-sufficiency complaints, after considering all of the evidence, we hold that a reasonable factfinder could have formed a firm belief or conviction that termination of J.R.L.'s and K.L.'s parental rights was in the children's best interest. The evidence is legally and factually sufficient to support the jury's best-interest findings. We overrule K.L.'s and J.R.L.'s third issues.

**Hearsay**

In their fourth issues, both K.L. and J.R.L. contend that the trial court erred by admitting the Department's Exhibits 1 and 2 over the hearsay objections of their counsel. Any error in the admission of testimony is rendered harmless if the objecting

party permits the same or similar evidence to be introduced without objection. *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex. 1989).

The following relevant exchange occurred:

Q.   Ms. Gray, I'm handing you what's been marked as Petitioner's Exhibit 1 and Petitioner's Exhibit 2.  Do you recognize those?

A.   They are the drug test results for Mr. and Mrs. [L.].

Q.   Exhibit 1, which parent does it pertain to?

A.   [K.L.]

Q.   And what result does it show?

A.   It shows a positive result for marijuana.

Q.   And Exhibit 2, which parent does it pertain to?

A.   [J.R.L.]

[J.R.L.'s Counsel]:  Objection, Your Honor.  This has not been admitted as evidence.  I'd object to her reading the results.

THE COURT:  I'll sustain.

….

[Department's Counsel]:  Your Honor, I would offer Petitioner's Exhibit 1 and 2 at this time.

(Petitioner's Exhibit Nos. 1 & 2 Offered)

[J.R.L.'s Counsel]:  Judge, objection.  It's hearsay. Without a business records affidavit filed with the Court 14 days prior to trial it's hearsay.

[K.L.'s Counsel]:  Your Honor, I have the same objection.]

THE COURT:  I'll admit the exhibits.  Overruled.

(Petitioner's Exhibit Nos. 1 & 2 Admitted)

> Q.    … And Ms. Gray, what was [sic] the results for Mr. [L.]?
>
> A.    His test was positive for methamphetamines and amphetamines.
>
> Q.    And at this time do you  - -  is it your belief that they were both using illegal substances at that time?
>
> A.    Yes, ma'am.

Although K.L. and J.R.L. objected to the admission of the exhibits, they permitted the relevant substance of the exhibits (*i.e.*, results of the drug tests) to be admitted without objection.  We therefore hold that even if the trial court erred by admitting the exhibits, such error was rendered harmless.  We overrule K.L.'s and J.R.L.'s fourth issues.

Having overruled all of K.L.'s and J.R.L.'s issues, we affirm the trial court's order of termination.


REX D. DAVIS
Justice


Before Chief Justice Gray,
     Justice Davis, and
     Justice Scoggins
Affirmed
Opinion delivered and filed March 5, 2015
[CV06]

